**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **SHAUN MOYERS** | **CIVIL ACTION** |
| **VERSUS** | **NO. 24-974** |
| **W. STOWE ET AL.** | **SECTION: P (2)** |

## ORDER AND REASONS

Before the Court is a motion for summary judgment[1] filed by Defendants, Plaquemines Parish Sheriff, Gerald A. Turlich, Jr., Plaquemines Parish Sheriff's Officer Willie Stowe, and Plaquemines Parish Sheriff's Officer John Wigstrom. Plaintiff, Shaun Moyers, filed an opposition[2] to the motion. And Defendants filed a reply.[3] For the reasons that follow, **IT IS ORDERED** that the motion is **GRANTED**.

**I.   BACKGROUND**

**A.  Facts[4]**

---

[1] R. Doc. 17.

[2] R. Doc. 19.

[3] R. Doc. 23.

[4] This section of the Court's opinion sets forth facts the Court finds are not in dispute. If there is an arguable dispute, the Court finds the dispute is not "genuine." Under Rule 56.1 of the Local Civil Rules for this Court, "[e]very motion for summary judgment must be accompanied by a separate and concise statement of the material facts which the moving party contends present no genuine issue." Under Local Rule 56.2, "[a]ny opposition to a motion for summary judgment must include a separate and concise statement of the material facts which the opponent contends present a genuine issue." According to Rule 56.2, "[a]ll material facts in the moving party's statement will be deemed admitted, for purposes of the motion, unless controverted in the opponent's statement." In support of their motion for summary judgment, Defendants submitted a roughly seven-page narrative of what they contend are the undisputed material facts. Defendants cite to statements made in Moyers's complaint and deposition testimony and to the video evidence. R. Doc. 17-2. In response, Moyers submitted a list of eight issues in a "Statement of Material Facts at Issue." But in numerous instances, Moyers failed to directly address Defendants' contentions, as the Local Rules require. Consequently, Moyers has failed to controvert many of Defendants' statements. Of the issues Moyers did address, some of the items identified by Moyers are not "material," *i.e.*, legally significant, (numbers 1, 5, 6); at least one is not a fact question (number 8); and others (numbers 2, 3, 4, 6, 7) are belied by the video evidence, the complaint itself, or Moyers's own deposition testimony. R. Doc. 19-1. For example, based upon the Court's review of the video evidence, the officers were courteous to Moyers, but this fact is not necessarily material. Also, because the Court did not need to consider Moyers's statements at the hospital to determine whether Defendants violated Moyers's rights (and because in some instances Moyers's summary judgment evidence failed to satisfy his burden after the burden shifted to him as the non-movant), the Court's opinion granting summary judgment is not based on anything that happened after Moyers was taken into custody, thus rendering immaterial, for example, Moyers's "material fact" number 5 ("[w]hether it is a material fact that Shaun Moyers advised the nurse this was all his fault and that the deputies were very professional"). See R. Doc. 19-1. In fairness to Moyers, the Court did not need to consider this

On the evening of July 14, 2023, Plaquemines Parish Sheriff's officers were dispatched to Plaintiff Shaun Moyers's trailer in Belle Chasse, Louisiana. Lieutenant Willie Stowe, Deputy John Wigstrom, Sergeant Ling, and Deputy Smithey arrived at the trailer park where Moyers was temporarily residing in response to a call from Moyers's soon-to-be-ex-wife, Ciji Moyers. Moyers had reportedly texted Ciji—who was living in Alabama at the time—a photograph of himself with what appeared to be a gun barrel in his mouth.[5] The photo was, reportedly, one message in an exchange of text messages suggesting Moyers wanted to kill himself. The exchange of messages included the following messages from Moyers: "I still have my 22 left it will go through the temple"; "I don't plan on waking up goodbye beautiful"; and "I'm about to go to sleep and I don't plan on waking up again."[6] This was the second time that day that Plaquemines Parish Sheriff's officers had gone to Moyers's trailer in response to a call from Ciji expressing concerns about Moyers's suicidal behavior.[7]

When Deputy Wigstrom and Lieutenant Stowe arrived at the scene, Deputy Wigstrom informed Moyers of the reason of the call, and Lieutenant Stowe convinced Moyers, who was wearing only shorts, to step out of his trailer to talk. But when asked if Stowe could search Moyers's trailer for weapons, Moyers refused. Moyers also refused to show Stowe his cell phone or any messages between Moyers and Ciji. When Stowe asked Moyers if he wanted to hurt himself, Moyers stated that he did not. And when Stowe asked Moyers how much alcohol he had consumed that day, Moyers stated that he had consumed a half gallon of alcohol.[8]

---

evidence to reach its decision on the issues presented in Defendants' motion. Most facts are taken from the police report, which Moyers's attached to his opposition and the video evidence.

[5] R. Doc. 1 ¶ 7; R. Doc. 19 at 1–2.

[6] The subject photograph and some of the text messages are part of the summary judgment record. R. Doc. 17-6.

[7] R. Doc. 19 at 2.

[8] R. Doc. 17-4 at 5.

Meanwhile, Sergeant Ling made contact with Ciji via cell phone. Ciji sent Ling the concerning text messages, including the photograph of Moyers with what appeared to be a gun in his mouth.[9] Ling showed Moyers the photo, but Moyers told Ling it was not him and that he did not know what was in the mouth of the person in the photo. Moyers also told Ling he did not have a gun. Ling again asked Moyers what was in Moyers's mouth. This time, Moyers replied that it was a broomstick from his bathroom. With Moyers's permission, Stowe retrieved the broomstick. The broomstick Stowe retrieved, however, was blue, and the object in the photo was black. This prompted Ling to question Moyers some more, to which Moyers became agitated. Consequently, Ling stepped away, and Stowe resumed questioning Moyers. Stowe asked Moyers why he sent the photo to his wife, and Moyers responded by asking why his wife was cheating on him.[10]

Deputy Wigstrom then joined the questioning. Wigstrom too asked Moyers what was in his mouth in the photo and eventually Moyers replied that it was a crowbar. When Wigstrom asked where the crowbar was located, Moyers replied that it was either in front of the trailer or that he had thrown it over the fence behind the trailer, but he could not remember. Learning that the object in the photo might be part of a shop vacuum, the officers asked Moyers if he had a shop vacuum. Moyers admitted he did and showed Stowe a shop vacuum with the black hard tube that the officers believed resembled the object in the photograph.[11]

After admitting to the officers that he had sent the photo, Moyers also admitted that he had been suspended from work and that he was not happy with the direction of his life. During this exchange, Moyers, who initially denied having a gun, advised the officers that he did indeed have

---

[9] *Id.*
[10] *Id.*
[11] *Id.* at 6.

a gun but that it was locked in his truck. After this sequence of events, the officers believed Moyers posed a danger to himself and decided they were going to bring him to a hospital for observation.[12]

The officers then approached Moyers, who was leaning over the tailgate of his pickup truck. Stowe advised Moyers that the officers were going to take Moyers to the hospital and instructed Moyers to place his hands behind his back. Moyers responded by asking why he was being taken to jail. The officers assured Moyers they were taking him to the hospital and not to jail. Stowe and Wigstrom then began trying to handcuff Moyers. Wigstrom was able to place Moyers's right wrist in a handcuff when Moyers suddenly exclaimed, "I'm about to f*cking hurt y'all." He then forcefully moved away from Stowe and Wigstrom. Moyers's right wrist remained in a handcuff, but his left wrist was free so that the other handcuff dangled from his right arm. Wigstrom tried to pin Moyers against the tailgate of his truck and gain control of Moyers's hands, but Wigstrom could not physically restrain Moyers.[13]

Meanwhile, Stowe, who had been assisting Wigstrom in the attempt to restrain Moyers, stepped a few feet away from Moyers. Stowe retrieved his taser and shouted, "Don't make me tase you." Wigstrom also moved away from Moyers. The officers thought Moyers was reaching into the bed of his truck.[14] Stowe then fired his taser and struck Moyers on Moyers's left side. Moyers, who at the time weighed nearly 300 pounds, was unaffected by the taser. Instead, he stared Stowe down, ripped the taser probes from his body, and threw the probes towards Stowe. Stowe then fired his taser a second time. But the second shot, like the first, did not appear to affect Moyers. Wigstrom, though, fired his taser almost simultaneously with Stowe's second shot. Wigstrom's

---

[12] *Id.* at 5–6.

[13] The entire episode involving the officers' efforts to take Moyers into custody was captured on video by the body cameras worn by Lieutenant Stowe, Deputy Wigstrom, and Deputy Smithey. This footage is part of the summary judgment evidence in this case. *See* R. Doc. 17-7 (referencing Manual Attachment "Exhibit 4"); *see also* R. Doc. 19-6 (referencing Manual Attachment "Exhibit E1-3").

[14] The body camera footage worn by Deputy Smithey shows Moyers reaching into the bed of the truck and shows Wigstrom backing away from Moyers.

shot was successful. Once struck with the probes from Wigstrom's taser, Moyers screamed, became incapacitated, and fell to the ground, breaking his left arm in the fall. Ling and Smithey then placed Moyers in handcuffs. After, the officers removed the taser probes and helped Moyers to his feet before placing him in the back of Wigstrom's patrol unit. Emergency Medical Services personnel then arrived on scene to examine Moyers and cleared him for transport to Ochsner West Bank Hospital, where Moyers was evaluated and released.[15] Moyers subsequently underwent surgery for his arm.[16]

### B. Relevant Procedural History

On April 18, 2024, Moyers filed this lawsuit against Lieutenant Willie Stowe, Deputy John Wigstrom, and Sheriff Gerald Turlich, Jr., in Turlich's personal and official capacities.[17] He claims that Stowe and Wigstrom used excessive force in violation of his constitutional rights and seeks compensatory and punitive damages under 42 U.S.C. § 1983, along with attorney's fees under 42 U.S.C. § 1988.[18] Moyers also claims that Stowe and Wigstrom committed "battery, intentional infliction of emotional distress and fault as those terms are understood in Louisiana tort law."[19] And he claims that Sheriff Turlich "is vicariously liable for the misconduct and fault of his employees, Lt. Stowe and Deputy Wigstrom[.]"[20]

---

[15] R. Doc. 17-4 at 6.
[16] R. Doc. 17-5 at 4.
[17] R. Doc. 1. A Supplemental and Amending Complaint was filed on April 19, 2024. But this complaint only amended the signature block to correct the office telephone number of Moyers's counsel. R. Doc. 3.
[18] *Id.* ¶ 22.
[19] *Id.* ¶ 23.
[20] *Id.* ¶ 24.

Defendants answered about two months later.[21] Then, in May 2025, Defendants filed the subject motion for summary judgment.[22] There has been adequate time for discovery, and the motion is ripe for adjudication.[23]

### C.  Parties' Arguments

In their motion, Defendants first contend that there was no constitutional violation. They assert that Moyers cannot show that he was deprived of the right to be free from excessive force under either the federal or state constitution.[24] Defendants second argue that they are otherwise entitled to qualified immunity.[25]  Defendants also assert that Sheriff Turlich cannot be held liable in his official capacity because there was no underlying constitutional violation, and even if there was, Moyers failed to show an official policy or practice that permitted the alleged civil rights violation.[26] They argue that Sheriff Turlich cannot be held liable in his individual capacity because he was not present at the scene and did not participate in the acts giving rise to Moyers's alleged damages.[27] As to the state law claims, Defendants argue that they are entitled to state statutory immunity and that Moyers has not pled a cause of action for battery.[28] They also contend that because they are entitled to summary judgment on the § 1983 claim, they are also entitled to summary judgment on the state law claims.[29]

In his opposition, Moyers maintains that Defendants improperly and prematurely resorted to overwhelming physical force, violating his Fourth Amendment right to be free from excessive

---

[21] R. Doc. 10.
[22] R. Doc. 17.
[23] *See* R. Docs. 12–16.
[24] R. Doc. 17-1 at 11–12.
[25] *Id.* at 12–13.
[26] *Id.* at 14–18.
[27] *Id.* at 13–14.
[28] *Id.* at
[29] *Id.* at 21.

force.[30] Moyers also contends that Defendants are not entitled to qualified immunity on summary judgment because there is a genuine issue of material fact as to whether the officers' conduct violated his constitutional rights and because the officers' actions were not objectively reasonable in light of clearly established law at the time of the conduct in question.[31] Because tasing Moyers was objectively unreasonable, Moyers argues, Defendants are not entitled to state statutory immunity either.[32]

## II.    LEGAL STANDARDS

### A.  Summary Judgment

Summary judgment is proper when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."[33] A federal court must view the facts in the light most favorable to the nonmovant.[34] Initially, the movant bears the burden of showing the absence of a genuine issue as to any material fact,[35] but the burden then shifts to the nonmovant to come forward with specific facts showing there is a genuine dispute for trial.[36] A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under the applicable law in the case.[37] A dispute about a material fact is "genuine" if it is one upon which a reasonable jury could return a verdict for the nonmoving party based upon the jury's resolution of the particular factual issue.[38] When assessing whether a dispute as to any material fact exists, a

---

[30] R. Doc. 19 at 5–9.
[31] *Id.* at 9–12.
[32] *Id.* at 13.
[33] FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).
[34] *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).
[35] *Celotex Corp.*, 477 U.S. at 323.
[36] *See* FED. R. CIV. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).
[37] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[38] *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 956 (5th Cir. 1993).

court considers all evidence in the record but refrains from making credibility determinations or weighing the evidence.[39]

## B. Qualified Immunity

Qualified immunity protects government officials from liability when they violate the law, but could have reasonably believed they were acting lawfully.[40] The qualified immunity doctrine tries to balance two competing societal interests: (1) the importance of a damages remedy to protect the rights of citizens and (2) the need for officials to be free from undue influence with their duties and potentially disabling threats of liability.[41] A plaintiff can defeat a qualified immunity defense by showing "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct."[42] When a defendant official moves for summary judgment on the basis of qualified immunity, the burden shifts to the plaintiff, who must rebut the defense by establishing a genuine issue of fact as to whether the official's allegedly wrongful conduct violated clearly established law.[43]

Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments" and, when properly applied, protects "all but the plainly incompetent or those who knowingly violate the law."[44] The law in the Fifth Circuit is clear that qualified immunity represents the norm,[45] and federal courts should deny a defendant qualified immunity only

---

[39] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins*., 530 F.3d 395, 398–99 (5th Cir. 2008) (first citing *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000); and then citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587).

[40] *Ramirez v. Killian,* 113 F.4th 415, 421 (5th Cir. 2024).

[41] *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806–07 (1982)).

[42] *Allen v. Cisneros*, 815 F.3d 239, 244 (5th Cir. 2016) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

[43] *Crane v. City of Arlington, Texas*, 50 F.4th 453, 461 (5th Cir. 2022) (citations omitted).

[44] *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

[45] *Romero v. City of Grapevine, Texas*, 888 F.3d 170, 176 (5th Cir. 2018) (quoting *Harlow*, 457 U.S. at 807).

in rare circumstances.[46]

Because a court must adhere to the axiom that, in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor,[47] this usually means adopting the plaintiff's version of the facts in the qualified immunity context.[48]   But when, like here, there is clear video evidence in the record, the court should rely on the video evidence, which can be dispositive on a motion for summary judgment.[49] Thus, video evidence can override the nonmovant's version of the facts if it "provides so much clarity that a reasonable jury could not believe his account."[50]

## III.    LAW AND ANALYSIS

### A.  Section 1983 Excessive Force Claim

Moyers's § 1983 excessive force claim fails because, under the first prong of the qualified immunity defense, the officers' use of the taser was not excessive under the Fourth Amendment. Even if the use of the taser was found to be excessive, the claim is barred under prong two of the qualified immunity defense because the officers did not violate any clearly established law when they tased Moyers.

#### i.  No Constitutional Violation

The Fourth Amendment to the United States Constitution protects an individual's right to be free from unreasonable search and seizure.[51] A violation of the Fourth Amendment occurs when

---

[46] *Brady v. Fort Bend Cnty.*, 58 F.3d 173, 173 (5th Cir. 1995), *dismissed* (Nov. 17, 1995) (quoting *Harlow*, 457 U.S. at 807).

[47] *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

[48] *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 325 (5th Cir. 2020) ("In qualified immunity cases, which often involve competing versions of events, we take the plaintiff's version of the facts, unless that version is blatantly contradicted by the record, so that no reasonable jury could believe it." (citation and internal quotation marks omitted)).

[49] *Crane v. City of Arlington, Texas*, 50 F.4th 453, 461–62 (5th Cir. 2022).

[50] *Id.* at 462.

[51] "The right of the people to be secure in their persons . . . against unreasonable . . . seizures, shall not be violated . . . ." U.S. CONST. amend. IV; *see also Graham v. Connor*, 490 U.S. 386, 394–95 (1989).

a seized person suffers an injury that results directly from a clearly excessive and objectively unreasonable use of force.[52] When determining whether an officer's use of force was excessive, federal courts consider three factors (the "*Graham* factors"): (1) the severity of the suspected crime; (2) whether the suspect posed an immediate threat to the safety of the officer or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.[53] In conducting this inquiry, a court must consider the totality of the facts and circumstances[54] from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.[55] Thus, in evaluating excessive force claims, courts are required to look beyond the moment an officer employs force and should consider how earlier facts and circumstances could affect how a reasonable officer might perceive and respond to later events.[56] In other words, "[t]he history of the interaction, as well as other past circumstances known to the officer, thus may inform the reasonableness of the use of force."[57]

The U.S. Supreme Court has counseled that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[58] Accordingly, whether a defendant's use of force was excessive or unreasonable is a fact-intensive and case-specific inquiry,[59] and it requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests that are alleged to justify the

---

[52] *Bartlett*, 981 F.3d at 332.

[53] *Harmon v. City of Arlington, Texas*, 16 F.4th 1159, 1163 (5th Cir. 2021) (quoting *Graham*, 490 U.S. at 396).

[54] *Barnes v. Felix,* 605 U.S.73, 83 (2025).

[55] *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio,* 392 U.S. 1, 20–22 (1968)).

[56] *Barnes*, 605 U.S. at 80.

[57] *Id.* at 80–81.

[58] *Graham*, 490 U.S. at 396–97.

[59] *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020) (quoting *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012)).

intrusion.[60]

Of the *Graham* factors, the second and third factors— "whether the suspect posed an immediate threat to the safety of the officers or others" and "whether the suspect was actively resisting arrest"—are the most determinative here. The first factor—"the severity of the suspected crime"—is less illuminating. Moyers was not engaged in a crime, at least when the police initially arrived on the scene. Accordingly, only the second and third factors will be analyzed.

As the evening progressed, Moyers's behavior became more unpredictable and steadily escalated until the moment the officers tased him, ultimately creating a threat to not only the officers but to himself. In the back-and-forth leading to the tasing, Moyers changed his story multiple times. For instance, he denied sending the subject photo of himself multiple times before admitting to sending the photo, and he denied having a gun before admitting to having a gun, which he alleged was locked in his truck. His behavior then climaxed when—mid arrest—he suddenly wrestled free from the officer's grasp and threatened to "f*cking hurt" the officers. Although he was unarmed, the officers believed he was reaching into the bed of his truck, the vehicle in which he claimed to have his gun.

And all of this occurred against a backdrop of events and circumstances that only further intensified the situation: Moyers, a nearly 300-pound man, had admitted to consuming a half gallon of alcohol when the officers first encountered him; the officers had read text messages expressing what appeared to be Moyers's intent to commit suicide; and officers had already been called to Moyers's trailer earlier that day for similar behavior. In fact, the reason the officers finally decided to place Moyers in handcuffs was to transport him to a hospital because they thought he posed a danger to himself. Thus, Moyers's volatile state, coupled with his anger, intoxication, and large

---

[60] *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (internal quotation marks omitted) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).

size, created an unpredictable situation where a reasonable officer could have concluded that Moyers posed an immediate threat to the safety of the officers and even Moyers himself.[61] And therefore the second factor weighs in favor the officers.

Regardless of the first and second factors, however, "a suspect's active resistance to arrest may justify this degree of force."[62] Although Moyers was not under criminal arrest, he was being placed in handcuffs to be transported to the hospital for involuntary mental health treatment.[63] Thus, the situation is analogous to one in which a suspect is placed in handcuffs when being arrested.

The Fifth Circuit cases on police use of tasers have paid particular attention to whether officers faced active resistance when they resorted to using a taser.[64] The Fifth Circuit has held it was reasonable to tase an arrestee where the arrestee had "aggressively evaded" two officers' "attempts to apprehend him" and because the officers tased him after the arrestee had "continuously failed to comply" and "other 'efforts to subdue [him] were ineffective.'"[65] In that case, the Fifth Circuit "took as further evidence of 'measured and ascending' action that 'neither officer used [his] taser as the *first method* to gain [the arrestee's] compliance.'"[66] In another case— one not involving a taser but "nonetheless relevant" according to the Fifth Circuit—the circuit "held that an officer reasonably pushed an arrestee onto the hood of a police cruiser, causing some bruises and chest pain, because the arrestee 'resisted when [the officer] attempted to place

---

[61] *See Cadena v. Ray*, 728 F. App'x 293, 296 (5th Cir. 2018) (finding that plaintiff's intoxication and erratic behavior gave officers, who had previously spoken calmly to him for several minutes, reason to believe plaintiff was a threat when plaintiff failed to comply with their request to turn around and be handcuffed and instead back peddled away from them).

[62] *Cloud v. Stone*, 993 F.3d 379, 384 (5th Cir. 2021).

[63] *See* LA. STAT. ANN. § 28:53(L)(1) (stating that person may be taken into protective custody and transported to treatment facility for an involuntary medical evaluation if law enforcement officers believe the person poses a danger to himself or others).

[64] *Cloud*, 993 F.3d at 384.

[65] *Id.* (discussing *Pratt v. Harris Cnty.*, 822 F.3d 174, 182 (5th Cir. 2016)).

[66] *Cloud*, 993 F.3d at 384–85 (discussing *Pratt*, 822 F.3d at 182).

handcuffs on him.'"[67] "Specifically, the arrestee had 'pulled his hand back and turned away from the officer,' then grappled with him briefly."[68] Moyers argues that in the moments immediately preceding being tased, he was not actively resisting arrest.[69] He also asserts that Stowe and Wigstrom did not use "measured and ascending actions that correspond[ed] to the escalating verbal and physical resistance," such as negotiations and verbal commands.[70]

Here, Moyers's behavior is like that of the arrestees in the cases relied on by the Fifth Circuit. First, like the latter arrestee who was thrown on the hood of the car, he resisted by moving away from officers when they tried put the handcuffs on him. Then, like the former arrestee, previous physical efforts to subdue him were ineffective. He evaded both Wingstrom and Stowe, and he continued to resist as Wingstrom tried to pin him to the truck, all the while with a handcuff dangling from one arm. And all this took place after Moyers threatened to "f*cking hurt" the officers. Coupled with the verbal aggression, Moyers's resistance was active, rather than passive.[71] And, therefore, the Court cannot find that it was unreasonable for Stowe to attempt to tase Moyers the first time.[72]

Even after been tased once by Stowe, Moyers was not subdued or otherwise restrained. [73] In fact, the video evidence shows that the first taser shot was almost completely ineffective. Rather

---

[67] *Cloud*, 993 F.3d at 385 (discussing *Collier v. Montgomery*, 569 F.3d 214, 219 (5th Cir. 2009)).

[68] *Cloud*, 993 F.3d at 385 (discussing *Collier*, 569 F.3d at 219).

[69] R. Doc. 19 at 9.

[70] *Id.* at 8–9.

[71] *Cf. Cloud*, 993 F.3d at 385 (describing cases where the Fifth Circuit has found passive or no resistance at all) (first citing *Newman v. Guedry*, 703 F.3d 757, 762–63 (5th Cir. 2012) (holding that officers could not tase someone who had not committed a crime, attempted flight, or disobeyed any commands, and who may have only provoked police with an "off-color joke"); and then citing *Ramirez v. Martinez*, 716 F.3d 369, 372, 378 (5th Cir. 2013) (finding excessive force when an officer tased someone who did no more than pull his arm out of the officer's grasp, and who was not suspected of a crime up to that point)).

[72] *See Pratt v. Harris Cnty.*, 822 F.3d 174, 182 (5th Cir. 2016) (finding officers were reasonable in using tasers when there was evidence of "measured and ascending" action and tasers were used only after other measures to subdue suspect were ineffective).

[73] *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 335 (5th Cir. 2020) ("Force must be reduced once a suspect has been subdued.").

13

than yield and submit to Stowe and Wigstrom, Moyers pulled Stowe's taser probes out of his body and threw them toward Stowe. Additionally, Stowe attempted to use some additional method of compliance by shouting at Moyers before tasing him. But even if the shouting is not found to be evidence of "measured and ascending action," the Court cannot find that requiring either Wigstrom or Stowe to make additional verbal requests of Moyers was necessary, where the purpose of trying to subdue Moyers was to get him to a hospital so he could be evaluated because the deputies were afraid he would kill himself, and the circumstances were clearly tense and rapidly evolving.[74] Further, Stowe and Wigstrom each shot their tasers after Stowe's initial shot within a second or two of one another, clearly unaware that the other officer was going to fire his taser. Thus, the Court cannot find that it was unreasonable for Wigstrom and Stowe to tase Moyers after Stowe's initial shot.

In short, when considering the totality of the circumstances, even drawing all reasonable inferences in Plaintiff's favor, the officers' use of their tasers was not clearly excessive or objectively unreasonable.[75] When the officers deployed their tasers, Moyers was unrestrained and unsubdued, had not complied with the officers' commands, continued to wield a swinging handcuff, and appeared to the officers to be reaching for something in the back of his truck. Because Moyers failed to meet his burden under the first prong of the qualified immunity inquiry, Lieutenant Stowe and Deputy Wigstrom are both entitled to qualified immunity on his § 1983 claim of excessive force.

---

[74] *Crane v. City of Arlington, Texas*, 50 F.4th 453, 464–65 (5th Cir. 2022); *see also Cloud*, 993 F.3d at 384–86 (finding officer's use of taser reasonable when suspect took a confrontational stance, turned to face officer with handcuffs dangling from left wrist, and thwarted officer's efforts to complete the arrest).

[75] *See e.g.*, *Salazar v. Molina*, 37 F.4th 278, 284 (5th Cir. 2022) (finding officer's use of taser was objectively reasonable before handcuffing the previously noncompliant suspect, who was in close physical proximity to officers, when the suspect was unrestrained at night and in the open and the suspect had just led the officers on a chase).

14

### ii. No Clearly Established Right

Because the Court finds Lieutenant Stowe and Deputy Wigstrom did not violate Moyers's Fourth Amendment rights, the Court need not reach the second prong of the qualified immunity analysis—whether the right was clearly established.[76] Nonetheless, to provide a complete analysis of the qualified immunity issues presented in this action, the Court will assume for the sake of argument there was a constitutional violation and analyze whether the officers' conduct violated clearly established law at the time of Moyers's alleged injuries.

Qualified immunity shields officers from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[77] While a plaintiff need not identify a case directly on point in order to show the law was clearly established, he must provide authority at a sufficiently high level of specificity to put law enforcement officers on notice that such conduct is definitively unlawful.[78] Without a closely analogous controlling case or a consensus of persuasive cases that serve to place the constitutional violation "beyond debate," a plaintiff's claims are barred by the doctrine of qualified immunity unless it is a rare obvious case in which the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances.[79]

Preliminarily, the facts of this case do not place it in the rare category of an obvious constitutional violation. That being the case, the Court must identify a controlling case or a robust consensus of persuasive authority where an officer acting under similar circumstances to the officers in this case was held to have violated an individual's Fourth Amendment right to be free

---

[76] *Pearson v. Callahan*, 555 U.S. 223, 236–37 (2009).
[77] *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021).
[78] *Est. of Parker v. Miss Dep't of Pub. Safety*, 140 F.4th 226, 242 (5th Cir. 2025) (quoting *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2025)).
[79] *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 330 (5th Cir. 2020) (citations omitted).

15

from excessive force.[80]  And the authority must pre-date the events of this case to have provided the officers here with fair notice of their legal obligations.[81]

The "clearly established" inquiry is demanding, especially when a court is faced with a claim of excessive force and regarding an officer's need to make split second decisions.[82] In such cases, "existing precedent must squarely govern the specific facts at issue such that only someone who is plainly incompetent or who knowingly violates the law would have behaved as the official did."[83]

Moyers cannot meet this exacting inquiry because it was not clearly established, as of July 14, 2023, that Stowe and Wigstrom would violate Moyers's rights when they deployed their tasers during a volatile exchange involving an upset, intoxicated 300-pound man who was actively resisting their efforts to handcuff him, who had just threatened to "f*cking hurt" them, who the officers believed was reaching into the back of his pickup truck for an object, and who they had reason to believe might want to die.

While it was clearly established that an officer could not use force on a suspect who is complying with his commands,[84] that rule does not match the facts of this case, as explained above. In the same vein, the Fifth Circuit has also held that when a suspect initially resists, any subsequent use of force must be reduced once the suspect has been subdued,[85] and after the suspect has been subdued and is no longer resisting, an officer's subsequent use of force is excessive.[86] But, again, that was not the case here.

---

[80] *Id.* at 338 (stating that a court need not limit its analysis to the cases cited by plaintiffs but must explain why cases it identifies prohibits the challenged conduct in a given case).

[81] *See Pearson*, 555 U.S. at 232.

[82] *Harmon v. City of Arlington, Texas*, 16 F.4th 1159, 1167 (5th Cir. 2021) (citations omitted).

[83] *Ramirez v. Escajuda,* 44 F.4th 287, 292 (5th Cir. 2022) (quoting *Bartlett*, 981 F.3d at 332).

[84] *Bagley v. Guillen,* 90 F.4th 799, 803 (5th Cir. 2024) (collecting cases).

[85] *Bartlett*, 981 F.3d at 335 (citations omitted).

[86] *Id.* at 341 (finding that continuing to inflict force despite suspect having committed no crime, presenting no threat, and giving no active resistance is a violation of clearly established law).

Moyers cites several Fifth Circuit cases arguing that the cases clearly establish that Stowe's and Wingstrom's conduct was unlawful. But these cases are not factually similar enough to the situation Stowe and Wingstrom faced to have placed the lawfulness of the taser use beyond debate.[87]  For example, Moyers cites *Cloud v. Stone*.[88] In *Cloud*, the Fifth Circuit held that officers may properly use "measured and ascending actions," including the use of a taser, corresponding to escalating verbal and physical resistance.[89] Mr. Cloud was pulled over for a minor traffic offense, but he refused to sign his traffic ticket.  The officer moved to arrest Cloud but had successfully handcuffed only his left wrist, at which point Cloud turned partially around to his left. The officer then ordered Cloud to turn back around and tried to finish handcuffing him, but Cloud spun around, turning away from the officer's reach and facing him with the handcuffs hanging from his left wrist. The officer stepped a few feet back and tased Cloud in the chest.  Cloud yelled, pulled the prongs from his chest, after which the officer grabbed Cloud around the waist and tased him again with the taser in "drive-stun" mode.[90] The Fifth Circuit concluded the evidence showed Cloud "actively resisted arrest," and the officer had "reasonable grounds to tase him."[91] The  court  distinguished Cloud's  actions  from  those  of  a person who is merely passively resisting,[92] concluding Cloud "was more than merely uncooperative or argumentative: his actions—not just his failure to follow directions—prevented [the officer] from completing a lawful arrest."[93]  In reaching its conclusion,

---

[87] Moyers's argument also requires the Court to assume that Fifth Circuit precedent alone can clearly establish the law for qualified immunity purposes, "something the Supreme Court has left open." *See Ramirez v. Escajeda*, 44 F.4th 287, 293 (5th Cir. 2022) (citing *Rivas-Villegas v. Cortesluna*, 595 U.S. 1 (2021)).

[88] 993 F.3d 379 (5th Cir. 2021).

[89] *Cloud v. Stone*, 993 F.3d 379, 384 (5th Cir. 2021).

[90] "When taser prongs are deployed, they conduct an electric current that can immobilize a person by causing his muscles to seize up. A taser in drive-stun mode inflicts a painful electric shock on contact, but does not cause the same seizing effect." *Id.* at 382 n.2.

[91] *Id.* at 385 (collecting cases).

[92] *Id.* at 386 (distinguishing *Cloud* from *Ramirez v. Martinez*, 716 F.3d 369 (5th Cir. 2013), and *Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012), both of which are relied upon by Moyers).

[93] *Cloud*, 993 F.3d at 386.

the court in *Cloud* discussed Fifth Circuit precedent establishing the reasonableness of the use of nonlethal force on one who is actively resisting. While Moyers cites *Cloud* to show it was clearly established that Stowe and Wigstrom could not lawfully act as they did when dealing with Moyers that night, the Court finds Plaintiff's reliance on *Cloud* is misplaced.

In *Ramirez v. Escajeda*,[94] not cited by Moyers and decided the year before these officers' encounter with Moyers, the Fifth Circuit gave qualified immunity to an officer after he responded to a 9-1-1 call regarding a suicidal suspect. The suspect was in the process of hanging himself and refused the officer's commands to show his hands. The officer, concerned the man had a weapon and that he might be walking into an ambush, used his taser on the man who died shortly afterwards.  The Fifth Circuit found significant that the suspect was not in custody, which created a tense and uncertain situation for the officer, who feared the suspect had a weapon.[95]  Indeed, the Fifth Circuit explained the law was not clearly established that an officer could not use taser force against a person who had not been subdued, and "who may be hanging himself, who may or may not have a weapon, who does not respond to the officer's commands—all when the officer approaches him rapidly, alone, and in the dark."[96]

As previously stated, *Escajeda* was decided in 2022, and Moyers has failed to identify any intervening case law between that decision and the events giving rise to this action that would have reasonably put Stowe and Wigstrom on notice that their conduct was clearly prohibited under the particular and specific circumstances of this case.  To the contrary, Moyers cites cases that are generally defined by a lack of any substantial threat to officer safety and a lack of resistance by

---

[94] 44 F.4th 287 (5th Cir. 2022).
[95] *Id.* at 293–94.
[96] *Id.* at 294. Indeed, *Escajeda* is particularly instructive in this case because, as Judge Duncan eloquently observed, "Escajeda used the taser precisely because Daniel was *not* in custody and Escajeda was unsure whether the strange scenario he faced posed a threat to his safety." Judge Duncan noted, "Perhaps his fear that he might be walking into an 'ambush' was unfounded; in that event, the tasing could be excessive under prong one of the analysis." *Id.*

18

the suspect at the time the officer resorted to the use of force.[97] The common thread in the cases Moyers cites is that the subjects in those cases were either already subdued and under police control, were not actively resisting arrest, were complying with police requests, or were subjected to excessive force after having been subdued.

Because Moyers has failed to identify a case that places "beyond debate" that Stowe and Wigstom's use of their tasers violated his Fourth Amendment rights, the Court finds the law was not clearly established at the time of events giving rise to this action. Because the Court finds Deputy Wigstrom and Lieutenant Stowe did not violate a clearly established statutory or constitutional right, Wigstrom and Stowe are entitled to qualified immunity.

### B.  Claims Against Sheriff Turlich

Plaintiff contends the alleged wrongful conduct by Stowe and Wigstrom occurred when they "were acting under color of state law and in the course and scope of their employment with the Plaquemines Parish Sheriff's Office,"[98] such that "Plaquemines Parish Sheriff, Gerald A. Turlich, Jr., is vicariously liable for the misconduct and fault of his employees." [99] Plaintiff's complaint seeks damages against Sheriff Turlich "in both his personal and official capacities."[100] Not only has Moyers waived or abandoned these claims, but his claims fail on the merits. The Court will analyze the claims under each of Sheriff Turlich's capacities.

### i.  Claims Against Sheriff Turlich in His Individual Capacity

---

[97] *See, e.g.*, *Darden v. City of Fort Worth, Texas*, 880 F.3d 722 (5th Cir. 2018) (finding officer violated established law when he used force against subdued, compliant subject who was not resisting arrest); *Newman*, 703 F.3d at 760 (finding it was objectively unreasonable for officers to injure man whose behavior did not amount to active resistance and who had not failed to comply with officers' commands); *Martinez*, 716 F.3d 369 (denying qualified immunity because plaintiff, who posed no threat to officers, was tased twice, including once after he was handcuffed and lying face down on the ground).

[98] R. Doc. 1 at ¶ 21

[99] *Id.* at ¶ 24.

[100] *Id.* at ¶ 4.

Defendants contend Moyers has not alleged that Sheriff Turlich participated in any of the acts involving his officers on the night Moyers was taken into custody. They also argue that Moyers cannot meet his burden of proof on his claims against the Sheriff in his individual capacity.[101] In his opposition, Moyers failed to address Defendants' arguments regarding his claims against Sheriff Turlich. The law is clear in this circuit that when a non-moving party fails to include argument about a claim, defense, or theory that a summary judgment motion seeks to dismiss, the district court can conclude that the nonmovant has abandoned the unaddressed claim.[102] Here, not only does the Court find that Plaintiff waived or abandoned his individual capacity claims against Sheriff Turlich by failing to address Defendants' arguments in his opposition memorandum, Moyers's complaint does not allege that Sheriff Turlich was involved in any of the interactions between his officers and Moyers on July 14, 2023, or that he was even aware of any of the alleged violations.

A plaintiff suing a governmental official in the official's individual capacity must allege specific conduct giving rise to a constitutional violation, and must explain how the government official, through his own actions, caused a deprivation of a plaintiff's rights.[103] Moyers, who has failed to plead any facts or provide any evidence that Sheriff Turlich is guilty of any fault in his personal capacity, cannot defeat Sheriff Turlich's claim of qualified immunity. Indeed, even putting aside the Court's finding of abandonment and waiver of these claims by Moyers, because the Court has found that Turlich's two officers who were on the scene and engaged with Moyers are entitled to qualified immunity, the Court also finds that Sheriff Turlich, who was not present

---

[101] R. Doc. 17-1 at 14.

[102] *Harris v. City of Schertz*, 27 F.4th 1120, 1123 (5th Cir. 2022); *Vela v. City of Houston*, 276 F.3d 659, 678–79 (5th Cir. 2001); *see also Dauterive v. Marcal*, No. 22-3067, 2025 WL 3628112, at \*10 (E.D. La. Dec. 15, 2025).

[103] *See, e.g.*, *Abbott v. Town of Livingston*, No. CV 16-00188-BAJ-EWD, 2018 WL 1095557, at \*4–5 (M.D. La. Feb. 27, 2018) (citations omitted).

on the scene and who had no interaction with Moyers that evening, is also entitled to qualified immunity in his individual capacity.

### ii.  Claims Against Sheriff Turlich in His Official Capacity

Although Moyers alleges Sheriff Turlich is vicariously liable for the misconduct or fault of his employees, a suit against a public servant in his official capacity is treated as a suit against a public entity.[104] While a public entity can be held liable under § 1983 when an official policy or custom is the cause of a plaintiff's injuries, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability.[105] Here, Moyers has failed to address any of Defendants' summary judgment arguments on his official capacity claims against Sheriff Turlich. Because Moyers failed to brief those claims in response to Defendants' motion for summary judgment, the Court deems Moyers's official capacity claims against Sheriff Turlich waived[106] and abandoned.[107]

Additionally, the Court finds that summary judgment is appropriate on Moyers's official capacity claims against Sheriff Turlich because Moyers has failed to put forth any evidence whatsoever that any injury he claims to have suffered arose from a constitutional deprivation arising from a violation of an official policy or custom of Sheriff Turlich's department.[108] For these reasons, the Court finds summary judgment is required on all of Moyers's official capacity claims against Sheriff Turlich.

---

[104] *Brandon v. Holt*, 469 U.S. 464, 471–72 (1985).

[105] *Williams v. Biggs*, No. CV 21-333, 2024 WL 776442, at *6 (E.D. La. Feb. 26, 2024), *appeal dismissed,* No. 24-30164, 2024 WL 5466853 (5th Cir. Oct. 31, 2024).

[106] *JMCB, LLC v. Bd. of Com. & Indus.*, 336 F. Supp. 3d 620, 634 (M.D. La. 2018) (citations omitted) (finding that failure to brief an argument in the district court waives that argument).

[107] *See Windsor v. Olson*, No. 3:16-CV-934-L, 2019 WL 2080021, at *9 (N.D. Tex. May 10, 2019) ("When a plaintiff fails to defend a claim in response to a motion to dismiss or summary judgment motion, the claim is deemed abandoned.") (citations omitted).

[108] *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (finding that municipality cannot be held liable for employee's actions when employee does not inflict a constitutional injury).

21

## C. State Law Claims

Moyers brings various state law claims. Each fails for its own reasons. The Court addresses each in turn.

### i. Battery, Intentional Infliction of Emotional Distress, and Fault

Relying on the same factual allegations that formed the basis of his excessive force claims under federal law, Moyers also brings claims under Louisiana state law, arguing that the actions of Defendants "constituted battery, intentional infliction of emotional distress, and fault as those terms are understood in accordance with Louisiana law."[109] Under Louisiana law, however, the standard of care owed by a sheriff's deputy when interacting with a person like Moyers and under circumstances like those in the instant case is one of "reasonableness under the totality of the circumstances."[110] Indeed, the Fifth Circuit has made clear that "excessive force claims under both federal and Louisiana law turn on whether the use of force was objectively reasonable given the totality of the circumstances."[111] Because, as Moyers concedes,[112] the factual allegations regarding his state law battery and general fault claims arise out of the same facts Moyers alleged with respect to his federal constitutional claims, for all the reasons the Court has previously cited in support its finding that Wigstrom and Stowe did not act unreasonably and did not violate Moyers's constitutional rights, Moyers's state law battery and general "fault" claims cannot survive Defendants' motion for summary judgment and must also be dismissed.

Turning to Moyers's claim for intentional infliction of emotional distress, Moyers offers nothing to support his allegation that the officers intended to inflict severe emotional distress upon

---

[109] R. Doc. 1 ¶¶ 6, 23.
[110] *Mathieu v. Imperial Toy Corp*., 646 So. 2d 318, 322 (La. 1994) (quoting *Kyle v. City of New Orleans*, 353 So. 2d 969, 973 (La. 1977)).
[111] *Shepherd ex rel Est. of Shepherd v. City of Shreveport*, 920 F.3d 278, 286 (5th Cir. 2019) (collecting cases).
[112] R. Doc. 19 at 14.

him or that the officers knew or were substantially certain to know that such distress would result from their actions.[113] Because Moyers has the burden of proof on his claim of intentional infliction of emotional distress, Defendants do not need to produce any evidence to negate the elements of Moyers's claim, and they can prevail on summary judgment by pointing out the absence of evidence to support the claim, as they have done in this case.[114] Accordingly, the Court is required to enter summary judgment in Defendants' favor on Moyers's intentional infliction of emotional distress claim.

### ii. State Law Immunity

While the Court has found that Moyers cannot recover against Defendants on his state law claims because he cannot meet his legal burden on those claims, the Court need not decide whether Defendants are, as they contend, immune from Moyers's claims under the protection provided by La. R.S. 28:53(L)(3). But for the sake of being complete in its analysis, the Court finds, under the facts of this case, and for all the same reasons the Court found no constitutional violation and no violation of Louisiana law, that Defendants are shielded under Louisiana state law immunity from Moyers's state law claims.

Under Louisiana Revised Statute § 28:53(L)(1), an officer can take a person into protective custody and transport him to a treatment facility for medical evaluation when, as a result of the officer's personal observation, the officer has reasonable grounds to believe the person is acting in a manner dangerous to himself or others and is in need of hospitalization to protect himself or others from physical harm.[115] Here, in light of the photograph and text messages that Moyers sent his wife, along with his statements to the officers and his actions in dealing with the officers, the

---

[113] *Curran v. Aleshire*, 67 F. Supp. 3d 741, 754–55 (E.D. La. 2014).
[114] *Muslow v. City of Shreveport*, 491 F. Supp. 3d 172, 200 (W.D. La. 2020).
[115] LA. STAT. ANN. § 28:53(L)(1).

Court has no trouble finding these deputies had reasonable grounds to believe Moyers was acting in a manner dangerous to himself. Louisiana's protective custody statute also provides that officers "may take reasonable steps to protect themselves," and an officer who acts in compliance with Louisiana's protective custody law "is acting in the course of his official duty and shall not be subject to criminal or civil liability as a result thereof."[116] Because the Court has found Wigstrom and Stowe acted reasonably during their encounter with Moyers, including in using their tasers to take him into custody, the Court finds Defendants are immune from civil liability under Louisiana state law for claims arising out of their actions in taking Moyers into protective custody.

### iii.  State Constitutional Claims

Finally, in his complaint, Moyer alleges Defendants violated his rights under the Louisiana Constitution, but Moyers has not set forth what specific provisions of the Louisiana Constitution were allegedly violated by Defendants or how Moyers's rights differ from federal constitutional law under Louisiana constitutional law. Regardless, Moyers cannot prevail on any separate Louisiana constitutional claim because excessive force claims under both federal and Louisiana law turn on whether the use of force was objectively reasonable given the totality of the circumstances.[117] Here, again, for all the reasons set forth above regarding the reasonableness of the officers' actions, Moyers's state constitutional claims cannot survive summary judgment and must be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (R. Doc. 17) is **GRANTED**.

---

[116] *Id.* § 28:53(L)(3).
[117] *Shepherd v. City of Shreveport*, 920 F.3d 278, 286 (5th Cir. 2019) (citations omitted).

Accordingly, **IT IS ORDERED** that all of Plaintiff's claims against all Defendants are **DISMISSED with prejudice.**

New Orleans, Louisiana, this 31st day of March 2026.

_____

**DARREL JAMES PAPILLION**
**UNITED STATES DISTRICT JUDGE**